Could we call the next case please? 16-0014, Vyla v. Dybka v. Dybka Could the attorneys presenting argument today please approach and introduce yourselves? Good morning. Good morning, your honors. My name is Steve Swalford on behalf of the defendants at Vyla v. Dybka discount roofing in 2700 North Pulaski. Mr. Swalford. Good morning. Good afternoon. Ed Swalford Jr. on behalf of Ms. Jaskula and her clients. Okay, good afternoon everyone. We are going to allocate 15 minutes per side. We will probably be a bit flexible with that. And Mr. Clinton, I believe you are the... I keep doing it wrong. Mr. Swalford, would you like to reserve a few minutes for rebuttal? All right, we will certainly do that. Whenever you are ready, sir. Thank you. This case involves the disqualification of a defense counsel pursuant to Rule 1.9 of the Illinois Rules of Professional Conduct. And there are two issues presented. First is whether there was a substantial relationship between the prior litigation in which defense counsel, principally U.S. Kims, represented both parties in the case of Barb, that is Violetta Jaskula, and Derek Dybka. And secondly, if there was a substantial relationship, and we believe there absolutely was not, whether the violation was waived when Violetta waited three years to file an emergency motion to disqualify U.S. Kims. The case of Barb involves a number of consolidated disputes involving business property, two businesses, residences, personal residences, and personal property. But as far as this case is concerned, it involves two businesses, Discount Roofing and the same as Construction, which were involved in the prior litigation and are involved in the present case. U.S. Kims represented Violetta in two of those prior cases, in the two prior cases. One was a case in which Celotex sued Discount Roofing with regard to the payment of invoices for shingles that Celotex had sold to Discount Roofing. And that eventually settled for some shingles, didn't it? That's settled. Yes, it settled. And it was an exchange of kind, wasn't it? It was basically an exchange of kind. There was a dispute over. The shingles. Right, right. Discount sued first. They said that the shingles weren't any good. Discount sued for breach of warranty first. And then Celotex followed by. The reason Violetta was joined personally was because of personal guarantee, which never came into dispute. There was no discovery taken about early assets or whatnot. It was solely a dispute over the money. It really wasn't a construction case, was it? That's what the judge said partially, that it was a construction case. But it was really about money only. That's right. It was bad shingles. And bad shingles. And in the attorney rule, there's two different ways that you'd have to get consent. One is if it's the same case, right? Correct. And no one's arguing that it's the same case. Right. But substantially related has some kind of – it's sort of almost a continuum, isn't it? It's not quite the same, but it's substantially related. Yes, the issues have to be the same. Some substantial subject matter. The first case that gets settled is about money owed for some shingles. Right. It was a 2000-2002 case. The guarantees were never acted upon. The only one that paid the money in the second lawsuit was discount. That's correct, Your Honor. All right. Okay. What's the second case? The second case was Wells Fargo Equipment – well, let's see. The name of the company was Wells Fargo Equipment Finance. And it involved the rental of a truck with a crane. It was essentially the same type of case. It was a lease of this truck. And this company, Save Max, at the time was a sole proprietorship. And nominally, Violetta was the owner of the sole proprietorship. Derek ran the company. And so her name was on the lease. That's not being disputed. No, it's not disputed. Are you saying, Gary, we're not disputing that she was the owner of Save Max? No, there was no dispute that she was, in effect, nominally represented. And that's not disputed. But the case was about the lease of a crane. And how much they owed on the lease per month.  And that was settled, too. And that was settled. That was settled. And that was settled. Took a while, though. Pardon? Took a while. Was that the one that took a while? That took a while. That really wasn't settled until it was settled in, oh, gee, 2006. Okay. But it really wasn't a construction case, either. Could you characterize it as a construction case? No. But that's what Judge Allen did say. He said it was a construction case. That's what he said. It was a construction case. And he said it was all the same parties. Even though there was a third party pursuing a corporation. But, of course, we wouldn't even be here if Violetta wasn't a party of those cases. No, but I'm saying that the individuals or the corporations involved were not the same. There was third parties, not Violetta, not Mr. Diveck, not the corporations. It was Wells Fargo. And in the second case, I'm sorry, that's the second case. The first case, it was Celotex, which became some other company. Right. Right. Okay. All right. So Mr. Kins deposed Violetta in the Wells Fargo case? He submitted Violetta. I'm sorry, he defended her deposition. The deposition for when Wells Fargo made a motion for summary judgment. And other than that, I think what I'm understanding is he had very little interaction with her. Dealt more with Derek. Yeah, that's correct. Yes. But he mentioned money all day. The cases were settled for money owed. Or she. For money, yes. That's correct. All right. Okay. That's correct. Well, my understanding of how you've been arguing this is that there was very little interaction between Violetta and Mr. Kins. But then we turn to Waver, and when you talk about Waver, I think what you're saying is she knew. She should have known. She should have brought this up earlier. Is it her knowledge that matters or counsel's? Her counsel's knowledge that matters with regard to when they could have raised the issue of Waver. Well, it is her knowledge. I mean, she admitted in her declaration that she knew she was dealing with him. She knew that he submitted her for a deposition. I mean, I. Don't the cases say, though, that it's not the attorney's knowledge? Waver? Yes, Your Honor. It's the party? It's the party. The party relinquishes a known right? That's correct. I mean, she was a. . . And she's been represented by counsel for three years in any event. Okay. Did Mr. Kins depose her in this case? In this case? Yeah. Has she been deposed in this case? I don't definitively. . . I don't think so, but I don't really know the answer to that question. I know that she was in court for several days when the Rupp-Owen case was tried. She was in court for a case that where Mr. Kins acted as counsel for Derrick and. . . Right. In 20. . . No, let's see. Does her affidavit in any way, shape, or form state a fact that she disclosed confidential information to Mr. Kins? No, she never makes that. . . She shows some grounds for disqualification, but she's never claimed that she imparted any information to him that was confidential. What is the third case about? I mean, the consolidated case that the judge is supposed to compare to the two earlier cases to see if they're either the same, which we know isn't here. I'm sorry. The money owed cases, whether they're substantially related to the combined or the consolidated cases in front of Judge Yellen. What's that case about? Well, it has something to do with her ownership of the Pulaski properties, which is property on which these companies do business, which would be Discount Roofing and Save Max, or her running, I suppose, of the companies with ownership issues. Okay. Not payment of invoices or renting of these transactions that took place back in the early 2000s. Okay. So your position is that the two cases that were resolved by settlement, even though they took a long time, which they did, were not substantially related to the commercial divorce or whatever the parties have decided to call it. But that's really your first argument, that under the LaSalle test that the court adopted in Schwartz, that the judge is supposed to make a really fine-tuned factual review and compare the prior litigation, see if it's substantially related to the present. That's right. What was the scope of his representation? What tasks was he hired to perform? What was the subject matter of the litigation? And while your Honor was pointing out this construction, was it about construction? I mean, I think the inquiry has to be much more focused than that. Well, there's three prongs. And in addition, you argue, don't you, that Judge Allen used sort of a different test when he said that, well, we have to look at the appearance of impropriety and we want to err on the side of caution. And wasn't that part of what his? Well, yeah, he did say that, and he did. And Schwartz, in which the court adopted, the Supreme Court adopted LaSalle test, specifically said that that is not to be used in this qualifying counsel. Well, the trial court further went on and didn't even consider the waiver test, because he said he could choose between adopting the substantial Rule 1.09 in waiver and he could just, so he didn't even really decide waiver. Well, he did kind of at the end. Pardon? He did kind of get rid of what he called the elephant in the room at the end. But what's the second part of the test? Confidentiality. What did he do? Confidentiality. When he talked about confidentiality, what did he, he focused on, solely on the length of the. Representation. The length of the representation without what was confidential that was revealed. And, you know, again, there's nothing in Violetta's. Affidavit. Declaration that ever claims to reveal anything confidential,  And really these cases, these two cases, these two are Wells Fargo and Solitech's case. Well, they went on for a long time. This is all about something that happened in, you know, this is a 2002. What was the other case? Wells Fargo. It was a 2004 case. This is about some things that happened before then. The case is centered upon actions that happened before then. And you still have to look at the subject matter of those two cases, which had still nothing to do with ownership of these two companies. And he never focused on what the subject matter of the cases were. He focused on what the title of the cases were. Discount roofing and Save Max. That's all he looked at. Well, he said the parties are all the same. And he said these are construction cases. These are construction cases. All right. What did he do with the confidentiality? He just focused on the time. It was a long time before it was settled. I can't imagine that something goes on for eight years when there's not, where there is not, you know, they have an attorney-client relationship of eight years. Or if it's not eight, it's six. I forgot when you filed your appearance. But either way, so you have an attorney-client relationship for that long and there's no confidential relationship. This is on page 79 of the transcript. I can't read it. And then he goes on to – Counsel, let me ask you something else. He let his attorneys talk a lot in the brief about the credibility findings. As I understand it, there were cross-affidavits, counter-affidavits, whatever you want to say, and oral argument. There's no evidentiary hearing on this motion. That's correct. Okay. So to the extent that Judge Allen was talking about the credibility, was he talking about the credibility of the argument that the attorney was making? Or was he talking – how are we – what are we supposed to make of this? And what's our standard of review? I mean, normally when you hear credibility, that word comes up in the appellate court. The next word that comes is defer. I'm not sure that – I don't believe that – I didn't search this document. I don't believe that Judge Allen actually used the word credibility. But as, you know, as I just read, he did say, are you kidding me? But that's what he was making a finding regarding. He was making something regarding confidentiality when he was talking about confidentiality. You know, Your Honor, I would argue that – I mean, we've mainly been arguing that he did not employ the correct standard because he did not focus on the subject matter of the two litigations. And, you know, he also didn't use the correct standard because he did appearance of impropriety and so on. And so our argument is basically, if you don't apply the law correctly, that's an abuse of discretion. And if you focus on the wrong facts, that's an abuse of discretion. So he didn't at any time look at the declarations and say that anything we said was untrue and make any credibility findings or discredit that. And like I say, the burden was on the plaintiff to establish a case of why we should be disqualified. And there's nothing in there about the passing of confidential information. Well, he did – I do want to ask you about this. He did eventually, I think, reject the waiver. And I think it was more than saying it was simply just a long time. I think what he said was that Mr. Kins was professing that in the second suit she didn't really do anything. He wasn't really in contact with her really in any of the suits. And, therefore, it was almost as if she had no knowledge that he was actually her lawyer. And, therefore, he was almost doing this sort of equitable kind of finding that how can you waive – how can you actually waive this consent you're entitled to when you don't really know that this lawyer who's professing to you that he really had no contact with her, how could she waive something when she doesn't really know he was her lawyer because he never really defended her because he was busy with Mr. Dyka and he wasn't – he was the go-between and there was no contact. So I think that's how he got it. I think he did eventually say, I'm not going to accept the waiver. Well, I'll concede what he said was less than clear. But assuming he said that, I, you know – I mean, she was submitted for a deposition by him. And, you know, she admits all this contact. But she also signed an affidavit that said she was allowing – Her declaration. No, I'm talking about – maybe it's not an affidavit. She actually – when one of the lawyers asked to withdraw, she was – she actually gave permission for the lawyer to withdraw so Mr. Kins could substitute. That's right, that's right. And then he became her lawyer. That's correct. So she's charged with this knowledge and, you know – Well, Save Max was actually – Pardon me? Save Max was actually the defendant in the second suit, right? Yes, yes, yes. So if she is Save Max, she should know who her lawyer is. That's correct, Your Honor. She was – yes, she was actually a defendant. She was – The company was. Yeah, pardon? The company. Yeah. Not her personally. The company. But she – no one's disputing that she was Save Max. All right. No one's – that's correct. Okay. So – You know, disqualification of counsel is a pretty serious matter. And especially after three years. Because it really deprived Mr. Dukov, his chosen counsel, who he spent a lot of money on. And just right on the eve of the trial – I mean, this even involves the resources of the court. I mean, I kind of think this was taken a little bit lightly with all due respect to the trial court. Just like three months before trial. And I really kind of think this was waiver as a matter of law. Although, the courts should – the courts really should – Isn't that your first argument? Pardon? Or did you go in reverse order? I think you did address waiver first. Did you not? I don't – I don't – Well, we've been – I know you've argued waiver. We've been back and forth on what to do. You've argued waiver. You've argued that the test wasn't properly conducted. The first time we filed a petition to leave to appeal to this court, which was the night we won the substantial. We won with a reward of 1.9. Oh, she briefly wanted to just comment on the fact that we're supposed to address 1. You definitely have to do that. I think under the Supreme Court's supervisory order, so. All right. And, you know, I really think that's certainly something we prefer in any event. Because I don't – I don't think that my client did – or not my client, but the U.S. cons – I mean, did anything wrong. I – if I'd been in the same position, my firm, I – we were no longer representing Viola at the time that he appeared in this case. And the cases are unrelated, or at least under the standards of Rule 1.9. And three years went by without any protests. So that kind of speaks for itself. A waiver is almost like implied consent, I would think. So unless there are any further questions. I don't think so. Thank you, Counsel, very much. We'll see you again in a minute. Mr. Clayton. May it please the Court, Counsel. I think a couple of things about the waiver issue may – I want to present perhaps another side of that. The current case is a fight over control of these companies. They're between the two people. The main issue in the case, and the issue is that for many, many years, K-1s went out that showed the two people as owners. School of 50-50 ownership. They had a fight in 2011. Mr. Dipka goes back and he essentially erases her from the corporation, changes to K-1s, moves on, and then the litigation starts. The situation between these two people is somewhat confusing because they are not married. But if you look at the exhibits and the record, most of the third parties dealing with them think that they are. So that's an important part of this. Is it really, though? Because if you look at those two cases, they're really about monies owed by a corporation. So what difference does it make that there were personal guarantees signed by two individuals? What difference does that make? It makes a great deal of difference because you get into what they own, who they are. And as I said, their business affairs are confusing. It's not straightforward. But how can you say that a suit for money owed for some bad shingles that apparently was resolved with two different settlements. Some of it was resolved with actually exchanging some shingles. True. And the rest was paid. Discount had to pay money for the shingles that Celotex claimed they owed them money for. And substantial attorney's fees. Okay. Substantial. How does that in any way substantially relate to a commercial divorce between these parties? And forget about that it took a long time to settle. Apparently everything takes a long time to settle. We know that, okay? That's true. How is this money owed for some shingles in any way substantially related to what has been described by all of you as a commercial divorce? Because the lawyer has to sort out who owns what because there are guarantees there. Is there any evidence in the record that anything that there's, is there any evidence in this record that a guarantee ever came into play anywhere? Yes, they suit on it. Yeah. That's coming into play. Did the individual pay the money? There's no evidence of payment on those guarantees, no. But there is an effort to collect on those guarantees. And who paid the money? Apparently discount did. Discount Ruffing did, yes. Do you have her affidavit, Andy? I do. Does she, does she say anywhere in her affidavit I disclosed confidential information to this attorney that I didn't believe was my attorney? She does. Does she ever say I gave him confidential information? She does not. That's true. Who's got the burden here? Who has to show that there was a contract? Jessica does. All right. So what is in her affidavit that would suggest that at any time she gave anything of a confidential nature to Mr. Kims? She doesn't claim that. We're not claiming that she does. Isn't that part of the test, though? It is part of the test, but there's also an inference you can draw from the complexity of the litigation. I know you don't agree, but the length of time is important. Yeah. The fact that these business relationships between these people are confused. They're very confused. This is not a straightforward setup here. We have two people who aren't married, and we have a woman guaranteeing obligations when she's not married. It doesn't make logical sense in a normal case. So what? I mean, it's a commercial case. It's a sign of ownership. We're the basic. Well, sure, but we're talking about fairly routine commercial cases here. Yes. With personal guarantees. So, okay, there's a surety or a guarantor. They are mundane, scrappy commercial disputes. No question about it. Yeah, I mean, the intricacies of Violetta's versus Derek's involvement in the operations doesn't seem to have anything to do with this. Sure it does. How? Because Mr. Kims has to know where it all leads back to. That's where they're going to collect from. And Judge Allen was right about that, that when those companies are looking at these people, they see companies, they see two people. They're going to want to get back to the people. They can have personal guarantee. They don't have to work very hard to do that. Did they take discovery on their financial holdings? There's no evidence in the record that they did. Okay. There's no evidence. Well, there's a collection down where they'd have to come in on a citation to discover assets and invest. There was none of that, no. Okay. But we don't, now in this current litigation, how this took some time to pop up to the surface is that discovery requests were submitted to DBCA, but he didn't answer them with the litigation file. There was never disclosed in the interrogatories the document request. So then current counsel, Ms. Zartzacki, did a litigation search, and that's how these things pop up to the surface. That's why it takes some time for this to emerge. They were not candid in their discovery answers. So they tried to, you know, I don't know what you can say about whether they tried to, but they sure didn't disclose it. They didn't say, by the way, we have 25 boxes of paper. Have I seen the underlying files in those cases? Only what's in the Circuit Court of Cook County. That's all we've seen. We don't know what's in their files. We have no idea. We never did get the deposition transcript. We tried to get it, but we've never gotten it. So discovery of the case is incomplete, and that's how this popped up late. There were lawyer changes, confusion, other issues. How did this come to, I don't want to get into attorney-client, but it's sort of hovering over this whole thing. What made you suddenly three months before trial decide to come upon this information? The litigation search was done. Ms. Zartzacki got involved in the case. The case had got, this case itself is confusing. There's two parts to it. Well, there's more than two parts to it, but there's two parts that have been involved. There's the Plevin action. Right. Mr. Dipka sued for his personal stuff. That's when it sort of erupted again. Yes. The Plevin action was actually tried. It was tried. And then you went to reconsider the court's findings. He's moved to reopen the proofs of that. So that's still kicking around. Okay. But is this? It pops up in the litigation search. No, but is the claim that we're talking about, is it the lawyer that gets to become, you know, the one that challenges the representation? Or are we really looking at what Ms. Jaskula knew? Aren't you like the fourth lawyers or something? I'm sorry to say we are. Yes. There were some suggestions there were five law firms before, but it was resolved to agree there were four. Do any of those law firms get to claim what she's claiming? I don't understand that. Okay. I'm not getting that. Do we get to consent? If the lawyer, if yours said, you know what, I represented you, does it have anything to do with your law firm figuring out this three years down the road or six years down the road? It's just by law that we figure this out. It matters when she knew about the representation. Right. Okay. All right. If her affidavit shows that she knew Mr. Kins, that he was in the background, there's no question about that. Did she know enough to know there was a conflict? We say no. Yeah, but it doesn't matter what you lawyers think. You agree with that, don't you? You can't hold the laypeople to the lawyer's standard. You've got to have a little sympathy for them. They look at the world in different eyes than we do. We owe duties to them. We have a fiduciary duty to them even when we drop the representation. So, you know, we have to have a little bit of, you know, understanding for their position. They're not going to understand there's a potential conflict. Did the court err when he said, I have to look at this based on the appearance of impropriety? No, because that's not really his decision. He did say that. There's no question he said that. But he's really saying that he thinks there's a substantial relationship, he's liked her time, identity of the parties, and the just general confusion about their business entities. No, he didn't make a mistake. He got this right. Well, I'm just asking because that's a Schwartz case. Doesn't it say that we do not look at an appearance of impropriety for purposes of permitting disqualification, which motions are strongly disfavored in the law? No question that the Schwartz case says that. We're not claiming it said anything else, and we're not arguing it perhaps of impropriety. And the court was on the moving standards. No question about it. And when the judge used the wrong standard. He did not use the wrong standard. Would you agree that if the court uses an improper standard in review, that that's considered an abuse of discretion? Normally it would be. I don't think he did, though. I think if you look at it, it's 40 pages before the decision. Well, you know, most of the decisions, there's really scant information. This is mostly you people arguing. The 85-page transcript is really mostly me, lawyers talking, not the judge. It's quite a bit of the judge questioning Mr. Kinn, saying he's not buying it, he can't accept it on face value, et cetera. Well, he started out by saying, well, waiver, you know, I don't know. This sure looks like waiver to me. Didn't he say that? He sure did. And then he got kind of, he started to do what he thought was the test. And he said, oh, these are two construction cases. And he said, all the parties are the same. That's what he did. That's what his factual determination was. There are construction cases. There's more to it than that. There's more to his factual determination. You know, you don't have your spin on it. I get it. But they were two construction cases, all the same parties, and then he said there was confidential information that was disclosed. He presumed that. Because of the guarantees. He presumed there was confidential information disclosed. I think, I don't know. Did he finish it off, or did he just say, did he go into the appearance? There's a third fraud for LaSalle, isn't there? Yeah. Did he do that? I think so. I think he says he thinks that the confidential information, you mean the discussion of whether it would be relevant to this action? Yeah. There's not a lot in there on that. But I think he's. But you think he covered it. I think he did cover it. You may be very. I think he did cover it. You may be right. And I think he covers it when he's talking about the guarantees. I think he covers the three frauds. Do you think there's any correlation between the code when it says the same or substantially related? What do you think the same case means? The same case is the industrial case that was decided by this court in 1993. Yes. And what does that mean? That means it's the same case. Exactly. I'm a part of that case too, unfortunately. And so do you think substantially related is like part of the spectrum? Like it has to be substantially related. There's long review articles that I could stack all the way up to the podium saying substantially related is not a clear test, that there are problems with it. Yeah. But you also have to actually analyze in a very critical way the factual circumstances of those two prior lawsuits. Correct. That's correct. And then look at this commercial divorce. That's right. All right. Okay. That's all I have. Thank you, Mr. Clement. Thank you very much. Judge McBride said it doesn't remind me of something I had in my presentation that I forgot to say. Yes, he did sort of. His standard was sort of, I bet Judge Estrada's standard was sort of are they related rather than whether they were substantially related. I'm sorry I had to say that. He took substantial out of the standard. I, you know, I just don't hear anything from my opponent about what harm there is by having U.S. represent his client more, whereas in this case, because of what knowledge he has or what knowledge he gained from the prior representation, it's going to harm Violetta, whereas, you know, disqualifying him for representing Mr. Divka is harmful. And I just ask that the trial court's order be reversed unless there's any questions. All right. Thank you, Mr. Swofford. Thank you, both sides. This is a very interesting case, very well argued. We'll take it under advisement and stand adjourned.